IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 14, 2016 Session

## STATE OF TENNESSEE v. KALPESH PATEL and PRATIKKUMAR V. PATEL

**Appeal from the Circuit Court for Rutherford County**
**Nos. F-71339A & F-71339B    David M. Bragg, Judge**

---

### No. M2016-00460-CCA-R3-CD

---

The Defendants, Kalpesh Patel and Pratikkumar V. Patel, were each convicted of one count of conspiracy to commit first degree murder, a Class A felony, and one count of solicitation to commit first degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-102, -103, -107. The trial court merged the solicitation convictions into the conspiracy convictions and sentenced each Defendant to fifteen years as Range I, standard offenders. On appeal, the Defendants raise the following issues: (1) both Defendants contend that the evidence was insufficient to sustain their convictions for conspiracy to commit first degree murder; (2) both Defendants contend that the trial court erred in denying their motions to suppress evidence retrieved during warrantless searches of their cell phones; (3) Defendant Kalpesh[1] contends that the trial court erred by not sentencing him as an especially mitigated offender; (4) Defendant Kalpesh contends that a new trial is warranted based on newly discovered evidence impeaching the State's primary witness; (5) Defendant Pratikkumar contends that the State withheld exculpatory evidence; and (6) Defendant Pratikkumar contends that he received ineffective assistance of counsel from his trial counsel.[2] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

John H. Baker III (on appeal), William B. Bullock (at trial), and Heather Graves Parker (at trial), Murfreesboro, Tennessee, for the appellant, Kalpesh Patel.

---

[1] Because the Defendants share the same last name, we will refer to them by their first names. No disrespect is intended.

[2] For the sake of clarity, we have reordered and renumbered the issues from how they appear in the Defendants' briefs.

Manubir S. Arora (at motion for new trial hearing and on appeal), Sara S. Becker (at motion for new trial hearing and on appeal), Atlanta, Georgia; J. Alexander Little IV (at trial), Worrick G. Robinson (at motion for new trial hearing and on appeal), and Edward M. Yarbrough (at trial), Nashville, Tennessee, for the appellant, Pratikkumar V. Patel.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Jennings H. Jones, District Attorney General; Sarah N. Davis and John C. Zimmerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**[3]

Christopher Robinson testified at trial that he was a construction worker living in Rutherford County and that he had never been arrested or in any kind of "criminal" trouble. Mr. Robinson further testified that he had known Defendant Kalpesh for six or seven years. Mr. Robinson explained that he had frequented one of Defendant Kalpesh's stores, that he got to know Defendant Kalpesh, and that he then began doing construction jobs at Defendant Kalpesh's stores and home. Mr. Robinson recalled that in September 2013, he was "doing a water line" at one of Defendant Kalpesh's stores when Defendant Kalpesh asked Mr. Robinson if he "would like to do some work for one of [Defendant Kalpesh's] cousins at another store." Mr. Robinson told Defendant Kalpesh that he "would be interested."

On September 29, 2013, Defendant Kalpesh called Mr. Robinson and asked him to meet at the store to discuss the work with Defendant Kalpesh's cousin. When he arrived at the store, Defendant Kalpesh had Mr. Robinson go to "the back room" where Defendant Pratikkumar was waiting for them. Mr. Robinson testified that he had never met Defendant Pratikkumar before. Mr. Robinson claimed that Defendant Pratikkumar had a gun "[o]n his side" during their meeting and this made Mr. Robinson "real nervous." According to Mr. Robinson, Defendant Pratikkumar stated that he needed "someone to kill [his] wife" and that he would pay $50,000 "to have it done." Mr. Robinson testified that he initially thought the Defendants "were joking around," but Defendant Pratikkumar "kept going into details [about] how he wanted it done."

Mr. Robinson explained that Defendant Pratikkumar wanted his wife shot and a "backup plan" in case "it could not go that route." According to Mr. Robinson,

---

[3] This section contains only the facts regarding the Defendants' convictions. The factual background of the Defendants' procedural issues will be addressed later in this opinion.

-2-

Defendant Pratikkumar wanted his wife killed "as soon as possible." Defendant Pratikkumar told Mr. Robinson that he would leave his house around 8:00 a.m., that he wanted his wife killed by 8:30 a.m., and that he "would come back and make sure the job was done." Defendant Kalpesh was to pay Mr. Robinson once Defendant Pratikkumar confirmed that his wife was dead. Mr. Robinson testified that Defendant Pratikkumar stated that his wife "had to be gone" and that Defendant Pratikkumar seemed "very excited" that his wife would soon be dead.

According to Mr. Robinson, Defendant Pratikkumar provided Mr. Robinson with his wife's address, a description of her car, and her license plate number. Defendant Pratikkumar told Mr. Robinson that Defendant Kalpesh would provide him with a gun the next day. Defendant Pratikkumar also told Mr. Robinson that his "daughter would be asleep in [her] bedroom" and that Mr. Robinson was to shoot his wife and "let the little girl sleep." Mr. Robinson recalled that "[i]t didn't matter" to Defendant Pratikkumar if he killed Defendant Pratikkumar's wife or arranged for someone else to "as long as it was taken care of." Mr. Robinson was left with the impression that "[t]he only thing [Defendant Pratikkumar] wanted to make sure [of] was that [his wife] was dead."

Mr. Robinson testified that Defendant Pratikkumar was "[k]ind of upset" when he suggested that Defendant Pratikkumar "get a divorce." According to Mr. Robinson, Defendant Pratikkumar stated "that he had two people in Gallatin that [were] going to take care of" killing his wife, but that he wanted Mr. Robinson "to do it" because Defendant Kalpesh trusted him. Mr. Robinson recalled that Defendant Kalpesh was in the room during this conversation with Defendant Pratikkumar and that Defendant Kalpesh was "shaking his head" in agreement with what Defendant Pratikkumar was saying.

Mr. Robinson testified that he was "in shock" during his conversation with the Defendants. Mr. Robinson further testified that he told Defendant Pratikkumar that he "would make sure that it happened" in order to "buy time for" Defendant Pratikkumar's wife. Defendant Pratikkumar then left the store. According to Mr. Robinson, he asked Defendant Kalpesh why Defendant Pratikkumar could not just get divorced and Defendant Kalpesh told him that Defendant Pratikkumar's "family would disown him if [he] got a divorce." Mr. Robinson also claimed that Defendant Kalpesh told him that Defendant Pratikkumar "had this planned for a long time." Mr. Robinson testified that he then left the store and went to work without telling anyone about what had happened because he "thought it was a joke."

The next morning, September 30, 2013, Defendant Kalpesh called Mr. Robinson and asked to meet him in the parking lot of a Sam's Club in order to pay him for a previous construction job. Defendant Kalpesh did not tell Mr. Robinson that Defendant Pratikkumar would also be there. Mr. Robinson parked his truck and, after a few

minutes, Defendant Kalpesh parked his van on one side of the truck and Defendant Pratikkumar parked his van on the other side of the truck. A recording from the Sam's Club's video surveillance system depicting the parking lot at approximately 9:30 a.m. on September 30, 2013, was played for the jury. Mr. Robinson identified his truck and the Defendants' vans on the surveillance video. According to Mr. Robinson, Defendant Kalpesh got out of his van and got into Defendant Pratikkumar's van. A short time later, Defendant Kalpesh called Mr. Robinson and told him that Defendant Pratikkumar wanted to talk to him.

According to Mr. Robinson, Defendant Kalpesh got out of Defendant Pratikkumar's van holding "a sack." Mr. Robinson testified that when he got in Defendant Pratikkumar's van, he asked "what was in the bag," and Defendant Pratikkumar responded that he had given Defendant Kalpesh "$50,000 in cash." Mr. Robinson further testified that Defendant Pratikkumar told him that Defendant Kalpesh was taking the money "to trade that cash in" at a different bank so "it would not be traced back to the bank" it was withdrawn from. Mr. Robinson claimed that Defendant Pratikkumar then "started describing everything that he wanted done." Defendant Pratikkumar gave Mr. Robinson a picture of his wife, and Mr. Robinson used his cell phone to take a picture of it. Defendant Pratikkumar also gave Mr. Robinson his address, a description of his wife's car, and "her tag number." Mr. Robinson testified that he wrote all of this information down on a piece of paper.

Mr. Robinson claimed that Defendant Pratikkumar said that he wanted his wife killed the next morning. According to Mr. Robinson, Defendant Pratikkumar told his wife that a "handyman" would be coming to their house that morning to make some repairs. Defendant Pratikkumar instructed Mr. Robinson to shoot his wife in their bedroom and to "throw stuff around" so it would look "like a robbery gone bad." Mr. Robinson further claimed that Defendant Pratikkumar told Mr. Robinson to let his daughter "sit there and cry" if she woke up during the murder. Mr. Robinson further testified that he and Defendant Pratikkumar discussed having "another person" commit the murder. Mr. Robinson claimed that he agreed to arrange the killing without "getting [any]thing out of it."

Mr. Robinson testified that he told Defendant Pratikkumar that he would "make sure that it got done" and went back to his truck. As Defendant Pratikkumar drove away, Mr. Robinson wrote down Defendant Pratikkumar's license plate number and a description of the van on the same sheet of paper that he had previously written down the information about Defendant Pratikkumar's wife on. Mr. Robinson testified that he then went to one of Defendant Kalpesh's stores. According to Mr. Robinson, Defendant Kalpesh gave him a box containing $15,000 in cash. Mr. Robinson also claimed that Defendant Kalpesh stated that he had not bought a gun, that he wanted Mr. Robinson "to

-4-

purchase the gun," and that he would give Mr. Robinson "a couple thousand dollars for the gun after it was all said and done." Defendant Kalpesh then allegedly instructed Mr. Robinson to dispose of the gun after the murder by throwing it in a river.

Mr. Robinson testified that, after the events of that morning, he believed the Defendants were serious about having Defendant Pratikkumar's wife killed. Mr. Robinson called a local attorney, Rick Mansfield, and told him about his conversations with the Defendants. Mr. Mansfield had Mr. Robinson call another local attorney who was a former prosecutor and had contacts with the Tennessee Bureau of Investigation (TBI). As a result of these conversations, Mr. Robinson was contacted by TBI Special Agent Caleb Utterback. Agent Utterback met with Mr. Robinson at one of Mr. Robinson's jobsites. Mr. Robinson gave Agent Utterback the box containing $15,000 and the piece of paper with the information he had written down during his meeting with Defendant Pratikkumar at Sam's Club. Mr. Robinson also showed Agent Utterback the picture of Defendant Pratikkumar's wife that he had taken with his cell phone.

Later that day, Defendant Pratikkumar called Mr. Robinson. Mr. Robinson did not answer the phone and contacted Agent Utterback. Agent Utterback arranged to meet Mr. Robinson in the parking lot of a local store, so Mr. Robinson could call back Defendant Pratikkumar and their conversation could be recorded. Defendant Pratikkumar did not answer his phone when Mr. Robinson called him, but he called Mr. Robinson back a short time later. This conversation was recorded and played for the jury at trial. Mr. Robinson started the conversation by confirming the license plate number of Defendant Pratikkumar's wife's car. The following exchange then occurred:

[Mr. Robinson]: [Okay], what time did you want me to be at Almaville Market tomorrow?

[Defendant Pratikkumar]: Um, you mean after you finish the work?

[Mr. Robinson]: Yeah, after the work[']s finished. I mean he's going to be doing the work, but what time do you want me there at the store?

[Defendant Pratikkumar]: Oh, you can meet anytime. I mean as soon as you call me from the store, the work is done; your work is done too.

[Mr. Robinson]: [Okay], so, and [Defendant Kalpesh] does have the rest of the money sitting there, right?

[Defendant Pratikkumar]: Yep . . . .

[Mr. Robinson]: [Okay], I mean, uh

-5-

[Defendant Pratikkumar]: I mean as soon as you know on your phone that it's done. You know? Then [Defendant Kalpesh] will take care of it. He'll get it before he gets there.

[Mr. Robinson]: [Okay], I just wanted to make sure, buddy, because my man is asking me, and I just need to make sure that everything's lined up and set to go. But you are sure you want this done?

[Defendant Pratikkumar]: What did you say?

[Mr. Robinson]: I said, you are sure that you want this done? Cause once I hang up it's over with. Come tomorrow at [8:30 a.m.] it's done.

[Defendant Pratikkumar]: Yes, I want everything done by [8:29 a.m.], not even [8:30 a.m.] . . . everything should be done.

[Mr. Robinson]: [Okay], you want it done by [8:30 a.m.]?

[Defendant Pratikkumar]: That's it. No back up now.

[Mr. Robinson]: [Okay], well, I'm not going to back out. What time are you going to be leaving the house?

[Defendant Pratikkumar]: [8:00 a.m.].

[Mr. Robinson]: [8:00 a.m.]. [Okay], well, everything is lined up, everything is set to go. I will not talk to you [any] more [un]til tomorrow. And once it's done, ah, make sure the money is there because my man's not going to play around.

[Defendant Pratikkumar]: That's it. You don't need to worry about the rest of the thing. As I say, once this work [is] done [the] right way, the way I want it, you will remember that day. I will always take care of you nicely . . . .

[Mr. Robinson]: [Okay], buddy, I do appreciate it, I'm fixing to get off here and, uh, I will talk to you tomorrow.

[Defendant Pratikkumar]: Yeah, I just need you to be 100%, that's what I need.

[Mr. Robinson]: 100%, you've got 110% of me.

[Defendant Pratikkumar]: That's it man.  Alright man.

[Mr. Robinson]: Alright, bye.

[Defendant Pratikkumar]: Bye.

Shortly after the first conversation ended, Defendant Pratikkumar called Mr. Robinson again wanting to make sure that he had "the address and everything."  Mr. Robinson confirmed Defendant Pratikkumar's address and the description of Defendant Pratikkumar's wife's car.  Then, the following exchange took place:

[Mr. Robinson]: I did, [okay].  That's what I wanted to make sure of so everybody's on the right page, and we asked you --

[Defendant Pratikkumar]: You are my handyman for my new store, [okay]? We are trying to build a counter.  And, uh, we are cool and everything and you can invest in it.

[Mr. Robinson]: [Okay].

[Defendant Pratikkumar]: So make sure you do my work, [okay]?

[Mr. Robinson]: Does your wife know that the handyman is going to be there to work on the doors and the floor in the morning?

[Defendant Pratikkumar]: Yes, sir.

[Mr. Robinson]: [Okay], and the baby is supposed to be asleep, right?

[Defendant Pratikkumar]: Yes.

[Mr. Robinson]: [Okay], that's all I need to make sure of buddy. Everything is set to go.

[Defendant Pratikkumar]: [Okay].  You got it.  Bye-bye.

[Mr. Robinson]: Bye.

Mr. Robinson testified at trial that he had no idea what Defendant Pratikkumar was referring to when he mentioned a counter being built at a new store.

Mr. Robinson admitted on cross-examination that he told the Defendants that he would not personally kill Defendant Pratikkumar's wife.  Mr. Robinson also admitted

that he told Agent Utterback that he had told the Defendants that he would "see what [he] could do." Mr. Robinson further admitted that he only pretended to find a "hitman" in order to "buy time" for Defendant Pratikkumar's wife and that he had no intention of actually hiring a "hitman" for the Defendants. However, Mr. Robinson testified that the Defendants did not know that he was pretending and that they believed he would "make [it] happen." Mr. Robinson speculated that the Defendants solicited him to kill Defendant Pratikkumar's wife because Defendant Kalpesh thought he was trustworthy.

Mr. Mansfield testified at trial that he was an attorney practicing mostly in real estate and probate law and that he had known Mr. Robinson for approximately twenty years. Mr. Mansfield explained that he had initially represented Mr. Robinson in a workers' compensation matter. Since the conclusion of that matter, Mr. Mansfield hired Mr. Robinson to do carpentry work for him on numerous occasions. Mr. Mansfield testified that he believed that Mr. Robinson was an "honest person" and that there was "no doubt in [his] mind" that Mr. Robinson was a truthful person. Mr. Mansfield explained that he trusted Mr. Robinson with the keys to his home and office and that he had referred Mr. Robinson to others who needed carpentry work done.

Mr. Mansfield recalled that Mr. Robinson called him on September 30, 2013, and that Mr. Robinson was "terribly upset." Mr. Robinson told Mr. Mansfield about his conversations with the Defendants and that he had been asked to kill Defendant Pratikkumar's wife. Mr. Mansfield testified that he contacted another local attorney, Thomas Parkerson, to ask what Mr. Robinson should do about his conversations with the Defendants. Mr. Parkerson told Mr. Mansfield that he would "hook [Mr. Robinson] up with the [TBI]." Mr. Mansfield had Mr. Robinson call Mr. Parkerson and that ended his participation in this matter.

Agent Utterback testified at trial and corroborated Mr. Robinson's testimony about their interactions on September 30, 2013. Agent Utterback testified that arrest warrants for the Defendants were issued after Mr. Robinson's recorded phone conversations with Defendant Pratikkumar. Agent Utterback arrested Defendant Kalpesh while other TBI agents arrested Defendant Pratikkumar. The Defendants' wallets and cell phones were seized during their arrests. After their arrests, subpoenas were issued for the Defendants' cell phone records and Defendant Pratikkumar's banking records. Agent Utterback admitted that he never found anyone who had agreed to kill Defendant Pratikkumar's wife and that he had no reason to believe that Mr. Robinson would do so.

Defendant Pratikkumar's banking records revealed that he had made cash withdrawals of $9,000 from a business account on September 3, September 6, September 12, September 18, September 20, and September 24, 2013. On September 30, 2013, Defendant Pratikkumar made a $9,000 withdrawal at 8:43 a.m. and an $8,000 withdrawal at 11:00 a.m. The $17,000 withdrawn on September 30, 2013, was Defendant

Pratikkumar's largest withdrawal of cash in the previous six months and the only instance during that time when he had withdrawn more than $10,000 in one day. The Defendants' phone records showed numerous calls between the Defendants from September 27 to September 30, 2013.

A forensic examination of the Defendants' cell phones was performed by TBI Special Agent Chet Mason. Agent Mason was able to recover text messages from Defendant Pratikkumar to Tina Newman and Marcus T. Henderson, Sr. Agent Mason was also able to recover a deleted text message from Defendant Pratikkumar to Defendant Kalpesh asking for Mr. Robinson's cell phone number as well as Defendant Kalpesh's response. Agent Mason testified at trial that the forensic examination revealed that Defendant Pratikkumar had deleted the call logs for his phone calls with Ms. Newman and the text messages, chat threads, and voicemails he had exchanged with her.

Agent Mason testified that he was able to recover Defendant Pratikkumar's deleted internet history from the cell phone. Prior to September 30, 2013, Defendant Pratikkumar had conducted several internet searches and visited several websites regarding topics such as "can a person go to jail if they accidentally killed someone when shooting a gun in the woods," "homicide definition," "if you shot someone by mistake is it criminal," "what is the prison sentence for killing someone on accident," "if you accidentally committed a serious crime and knew you would go to jail, would you run," and "can you get in trouble if you accidentally kill someone while cleaning your gun."

Ms. Newman testified at trial that she was a recent college graduate and worked at a domestic violence shelter. Ms. Newman recalled that in May 2010, she had gone on a "study abroad" trip to India. In September 2010, Ms. Newman met Defendant Pratikkumar at one of his stores and struck up a conversation with him about the fact that she had "just got back from India." Ms. Newman testified that a few weeks after their initial conversation, she "friended"[4] Defendant Pratikkumar on Facebook and they scheduled a lunch date. Ms. Newman further testified that she divorced her husband in January 2011. According to Ms. Newman, she began working as "the errand girl" for Defendant Pratikkumar and began a romantic relationship with him around the time of her divorce.

Ms. Newman testified that she was in a romantic relationship with Defendant Pratikkumar from January 2011 until his arrest in October 2013. Ms. Newman would share her class schedule with Defendant Pratikkumar so "he could arrange his schedule to" hers. When Ms. Newman moved to Cookeville to finish college, Defendant

---

[4] "Friending" is defined as "the act of adding someone to a list of 'friends' on a social networking service." Friending and Following, Wikipedia, http://en.wikipedia.org/wiki/Friending_and_following (last visited June 21, 2017).

Pratikkumar would visit her at least once a week. Ms. Newman testified that Defendant Pratikkumar helped pay her rent and college tuition. Ms. Newman made Defendant Pratikkumar the beneficiary of her life insurance policy. Ms. Newman and Defendant Pratikkumar took trips together. On those trips, Defendant Pratikkumar would refer to Ms. Newman as his wife. According to Ms. Newman, the Defendant told her that he loved her and that if they could not be together, she "may as well just . . . shoot [him]."

Defendant Pratikkumar introduced Ms. Newman to Defendant Kalpesh. Ms. Newman testified that the Defendants were very close and referred to themselves as "cousin brothers." Ms. Newman further testified that she believed Defendant Kalpesh knew she was in a romantic relationship with Defendant Pratikkumar. Ms. Newman introduced Defendant Pratikkumar to her parents. Ms. Newman testified that she was "really devastated and heartbroken" when she learned that Defendant Pratikkumar's wife was pregnant. In May 2013, Ms. Newman went to India and met Defendant Pratikkumar's family and stayed with them.

Ms. Newman testified that when she returned from her trip, she had a conversation with Defendant Pratikkumar and asked him, "[A]re we doing this or are we not doing this?" Ms. Newman recalled that Defendant Pratikkumar was "very quiet and shocked" about her question. According to Ms. Newman, Defendant Pratikkumar said that he was "working on it" and that they would "be together real soon." Ms. Newman also recalled that Defendant Pratikkumar wanted her assurance that she would be a good mother to his daughter.

Ms. Newman testified that in September 2013, Defendant Pratikkumar told her that it was okay for her to leave voicemails on his cell phone. Ms. Newman admitted that she and Defendant Pratikkumar were calling each other "darling" and texting "I love you" to each other around September 30, 2013. Ms. Newman recalled that on September 30, 2013, Defendant Pratikkumar told her that he was meeting Defendant Kalpesh because Defendant Kalpesh was going to repay some money he owed Defendant Pratikkumar.

Ms. Newman testified that Defendant Pratikkumar called her after his arrest and told her that he was in a lot of trouble and that she should not talk to anyone. Several weeks after Defendant Pratikkumar's arrest, Defendant Pratikkumar's father and a translator came to Ms. Newman's home. Ms. Newman claimed that they asked her to come to a van where Defendant Pratikkumar was waiting to speak to her. Ms. Newman denied knowing about Defendant Pratikkumar's plan to kill his wife.

Mr. Henderson testified at trial that he was the owner of Henderson Financial Group and that his firm catered to "affluent investors [and] affluent business owners." Mr. Henderson recalled that Defendant Pratikkumar was referred to him by one of his

clients. Mr. Henderson met with Defendant Pratikkumar in July 2013 to discuss issuing life insurance policies for Defendant Pratikkumar and his wife. Initially, Defendant Pratikkumar asked for a one million dollar policy on his wife. He then asked for a two and a-half million dollar policy before finally requesting a six million dollar policy. Defendant Pratikkumar had a five million dollar policy taken out for himself. The insurance policies were issued in August 2013.

Mr. Henderson testified that he did not think the six million dollar policy was excessive given the financial information Defendant Pratikkumar provided him. Mr. Henderson further testified that the insurance company would not have issued the policy if it were excessive. Mr. Henderson met with both Defendant Pratikkumar and his wife before the policies were issued. Mr. Henderson recalled nothing out of the ordinary occurred during their meeting. Mr. Henderson testified that nothing seemed unusual about their relationship and that there were no "red flags."

Mr. Henderson testified that Defendant Pratikkumar wanted to take out a second life insurance policy on his wife valued at four million dollars. Mr. Henderson recalled that Defendant Pratikkumar wanted ten million dollars in life insurance for his wife because her family was not as rich as his and he wanted to ensure that all their debts would be paid off if she died. However, prior to September 30, 2013, Defendant Pratikkumar requested that the application for the four million dollar policy be withdrawn because the insurance company issuing the policy had more stringent health requirements and the policy was going to be more expensive than the original quote.

Defendant Pratikkumar's wife, Krupaben Patel, testified at trial in his defense. Ms. Patel testified that she and Defendant Pratikkumar were partners in the ownership of two gas stations. Ms. Patel further testified that she participated in the decision to take out the life insurance policies. According to Ms. Patel, Defendant Pratikkumar told her about his affair with Ms. Newman after his arrest and she forgave him. Ms. Patel testified that she had never spoken to the prosecutors about this case. Ms. Patel admitted that no handyman came to her house on October 1, 2013.

Based upon the forgoing, the jury convicted each of the Defendants of one count of solicitation to commit first degree murder and conspiracy to commit first degree murder. The trial court subsequently merged the solicitation convictions into the conspiracy convictions. Following a sentencing hearing, the trial court sentenced each of the Defendants to fifteen years as Range I, standard offenders. With respect to Defendant Kalpesh, the trial court found that no enhancement or mitigating factors applied. However, the trial court noted that neither of the Defendants had "a significant prior criminal record" and took "that into consideration."

## ANALYSIS

### I. Sufficiency of the conspiracy convictions

The Defendants contend that the evidence was insufficient to sustain their convictions for conspiracy to commit first degree murder.[5] The Defendants argue that the evidence was insufficient because "no one who was a party to the conspiracy can be said to have agreed to engage in conduct that constitutes the offense of [first degree] murder." The State responds that the evidence was sufficient to sustain the Defendants' convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

---

[5] A significant portion of Defendant Pratikkumar's brief challenges the trial court's denial of his motion for judgment of acquittal at the close of the State's case-in-chief. Defendant Pratikkumar waived appellate review of the trial court's denial by presenting his own proof, the testimony of his wife, Ms. Patel, after the State's case. See State v. Collier, 411 S.W.3d 886, 893 (Tenn. 2013). However, this does not prevent Defendant Pratikkumar from challenging the sufficiency of the evidence. Id. Defendant Pratikkumar briefly raised the sufficiency of the evidence as an issue in his brief, mostly by referencing to his argument regarding the trial court's denial of his motion for judgment of acquittal. We will address those arguments, along with Defendant Kalpesh's, in this section.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As pertinent to our review:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Tenn. Code Ann. § 39-12-103(a). Additionally, the State must prove that "an overt act in pursuance of the conspiracy . . . [was] done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d). It is not a defense "that the offense that was the object of the conspiracy was not committed." Tenn. Code Ann. § 39-12-103(f). The underlying offense of the conspiracy at issue here was first degree murder, which is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

Also pertinent to our review:

> If a person guilty of conspiracy . . . knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with the other person or persons, whether or not their identity is known, to commit the offense.

Tenn. Code Ann. § 39-12-103(b).

The Defendants cite to Delaney v. State, 51 S.W.2d 485, 487 (Tenn. 1932), for the following proposition:

> There can be no criminal combination or conspiracy unless at least two persons guiltily unite or agree in the purpose to pursue the unlawful enterprise; and, if one of the two only feigns acquiescence in the proposal

-13-

of the other, without criminal intent, there is no such agreement or concurrence in fact, and no conspiracy.

However, this rule only applies in situations involving an alleged conspiracy between one defendant and one person feigning participation in the conspiracy. See United States v. Hayden, 68 Fed. Appx. 530, 532 (6th Cir. 2003) (noting that "[t]he rule that government agents do not count as coconspirators . . . is limited to situations in which the conspiracy involves only one defendant and a government informer" and that evidence from a government informer "may be used as evidence of a conspiracy between the defendant and other conspirators").

To be guilty of conspiracy, a defendant does not need to "'agree to commit or facilitate each and every part of the substantive offense.'" Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016) (quoting Salinas v. United States, 522 U.S. 52, 63 (1997)). Instead, "[a] defendant must merely reach an agreement with the 'specific intent that the underlying crime be committed' by some member of the conspiracy." Id. (quoting 2 K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions: Criminal § 31:03, p. 225 (6th ed. 2008)). As such, the State did not have to prove that the Defendants intended to kill Defendant Pratikkumar's wife themselves in order for the Defendants to be convicted of conspiracy to commit first degree murder as long as they agreed that the murder would be committed by another member of the conspiracy.

The evidence at trial established that the Defendants initially sought to have Mr. Robinson agree to kill Defendant Pratikkumar's wife, but then agreed that Mr. Robinson would arrange for a fourth conspirator to commit the murder. The Defendants argue that they cannot be convicted of conspiracy to commit first degree murder because Mr. Robinson only feigned participation and never really intended to kill Defendant Pratikkumar's wife or procure a fourth conspirator to commit the killing. In essence, the Defendants argue that it was impossible for a conspiracy to be formed because no one who actually intended to commit the offense was a party to the conspiracy.

However, impossibility is not a defense to inchoate offenses such as conspiracy. "'In our opinion the consequence of intent and acts such as those of [the] defendants here should be more serious than pleased amazement that because of the timeliness of the police the projected criminality was not merely detected but also wiped out.'" Brandy v. State, 575 S.W.2d 278, 280 (Tenn. 1979) (quoting People v. Rojas, 358 P.2d 921, 924 (Cal. 1961)) (rejecting the defenses of factual and legal impossibility with respect to the similar inchoate offense of criminal attempt); see also State v. Houchin, 765 P.2d 178, 182 (Mont. 1988) (fact that "the intended victim of [a] deliberate homicide was fictitious" did not bar the existence of a conspiracy to commit a deliberate homicide).

-14-

Therefore, as long as the Defendants actually agreed to the commission of the subject offense, intended for the offense to be committed, and they committed at least one overt act in pursuance of the conspiracy, there would be sufficient evidence of a conspiracy to commit first degree murder regardless of Mr. Robinson's lack of intent to commit the underlying offense or procure a fourth conspirator to do so. See State v. March, 494 S.W.3d 52, 75 (Tenn. Crim. App. 2010) (holding that the "identity of the killer [is] not an element of the offense [of conspiracy to commit first degree murder] that the [S]tate [has] to prove"); see also Tenn. Code Ann. § 39-12-103(b) (allowing for a "chain conspiracy" where the person who will commit the underlying offense is unknown to the defendant so long as the defendant knows that one of his coconspirators "has conspired with" the unknown person).

Viewed in a light most favorable to the State, the evidence at trial established that Defendant Pratikkumar wanted his wife killed because of his lengthy romantic affair with Ms. Newman. In the months before Mr. Robinson was approached by the Defendants, Defendant Pratikkumar informed Ms. Newman that he was working on ending his marriage and conducted several internet searches regarding the penalties for accidentally shooting and killing a person. Defendant Kalpesh approached Mr. Robinson, who had worked for him for a number of years, about doing some work for his cousin, Defendant Pratikkumar. Defendant Kalpesh arranged a meeting between Mr. Robinson and Defendant Pratikkumar at one of his stores. Defendant Kalpesh attended that meeting and shook his head in agreement as Defendant Pratikkumar asked Mr. Robinson to kill Ms. Patel.

The next morning, Defendant Kalpesh arranged a second meeting between Mr. Robinson and Defendant Pratikkumar in the parking lot of a local Sam's Club. Mr. Robinson saw Defendant Kalpesh leave Defendant Pratikkumar's van with "a sack." At that meeting, Defendant Pratikkumar told Mr. Robinson that the "sack" contained the payment for his wife's murder and that Defendant Kalpesh was going to "trade that cash in" to avoid it being "traced back" to Defendant Pratikkumar. Defendant Pratikkumar also provided Mr. Robinson with details about where his wife would be the next morning and a picture of her. Mr. Robinson later met with Defendant Kalpesh. Defendant Kalpesh gave him a box containing $15,000 as an initial payment for the murder of Defendant Pratikkumar's wife, instructed Mr. Robinson to purchase a gun, and said that he would pay him back for the gun. Defendant Pratikkumar then called Mr. Robinson to confirm the details regarding when and where the offense was to be committed. Based upon the foregoing, we conclude that the evidence was sufficient to sustain the Defendants' convictions for conspiracy to commit first degree murder.

## II. Warrantless searches of the Defendants' cell phones

The Defendants contend that the trial court erred in denying their motions to suppress the evidence retrieved during warrantless searches of their cell phones. The Defendants argue that the evidence is not admissible under the independent source doctrine because Agent Utterback, after consulting with the prosecutor assigned to this case, reviewed the data on the Defendants' cell phones prior to making his decision to apply for a search warrant for the cell phones. The State responds that the evidence is admissible pursuant to the independent source doctrine because Agent Utterback did not refer to the unlawfully seized evidence in his application for a search warrant. Alternatively, the State argues that the good-faith exception recently adopted by our supreme court in State v. Reynolds, 504 S.W.3d 283 (Tenn. 2016), applies to the warrantless searches of the Defendants' cell phones. The Defendants reply that the good faith exception does not apply because there was no binding appellate precedent allowing for the warrantless search of cell phones when their phones were originally searched by Agent Utterback.

## A. Factual background

The Defendants each filed a motion to suppress the evidence recovered as a result of the warrantless search of the data stored on their cell phones following the United States Supreme Court's decision in Riley v. California, 134 S. Ct. 2473, 2493 (2014), which held that "a warrant is generally required before" a search of the information on a cell phone, "even when a cell phone is seized incident to arrest." The trial court held a hearing on the motions on December 10, 2014.

At the hearing, District Attorney General Jennings H. Jones testified that, at the time the Riley opinion was issued, he was the Assistant District Attorney General assigned to this case. General Jones was contacted by defense counsel shortly after the Riley opinion was issued and was informed that the Defendants would file motions to suppress the evidence recovered from their cell phones based on Riley. General Jones testified that prior to the Riley decision, he operated on the assumption that a cell phone could be searched incident to arrest. However, General Jones admitted that there was "no case law" that he was aware of to support that assumption.

After reviewing Riley, General Jones was "worried about the admission" of the information taken from the Defendants' cell phones. General Jones testified that he contacted Agent Utterback and asked Agent Utterback if it would be "worthwhile to fight about it." General Jones recalled that Agent Utterback told him that "there was worthwhile evidence on the cell phone[s]." At that point, General Jones instructed Agent Utterback to get a search warrant based on "[e]vidence that came about before he ever opened up the phone[s]."

-16-

Agent Utterback testified that after the Defendants' cell phones were seized incident to their arrest, he copied the data from their phones onto a "thumb drive" using a Cellebrite device. Agent Utterback explained that this process was better and less time consuming than looking through the phones and taking individual pictures of each screen or message. Agent Utterback stated that he did not review the information taken off of the cell phones at that time. Agent Utterback explained that he thought he did not need a warrant to search the cell phones because "[t]he phones were searched incident to a lawful arrest." Agent Utterback further explained that he believed this based on his training, the fact that it was "a regular practice" of TBI agents, and because "officers [] on the side of [the] road[] on traffic stops were searching phones incident to arrest."

Agent Utterback testified that General Jones contacted him after Riley had been issued and asked him to "look at [the phones], and see what's in there, and see if it's worth [] getting a search warrant." Agent Utterback then testified as follows: "I scrolled through the text messages. And I saw text messages on there that would be beneficial to the prosecution of this case. And I called [General Jones] back, and I told him that we probably needed those text messages." Agent Utterback explained that he "thought that the text messages . . . would be vital to the prosecution of [their] case." At that point, General Jones instructed Agent Utterback to get a search warrant for the phones.

Agent Utterback testified that, unrelated to his search of the cell phones, he had subpoenaed the phone records of the Defendants and Mr. Robinson. Agent Utterback used the information from the subpoenaed phone records in his warrant affidavit for the cell phone date, but he did not use any of the information he had seen during his review of the cell phone data. Agent Utterback testified that he had told the issuing judge that he had already searched the cell phones, but that he had not included that information in his warrant affidavit. The warrant for the cell phone data was issued on July 10, 2014.

On December 19, 2014, the trial court issued a written order denying the Defendants' motions to suppress. The trial court concluded that the original searches of the cell phones by Agent Utterback were illegal pursuant to Riley. However, the trial court held that the exclusionary rule did not bar the admission of the evidence seized from the cell phones because the search warrant issued in July 2014, was "based on an independent source." The trial court additionally found that "the State would still have sought a warrant to search the cell phones regardless of [the] information obtained from the pre-Riley search."

**B. Standard of review**

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v.

Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)).  Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact.  State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008).  When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them."  Id.  Conversely, a trial court's conclusions of law, along with its application of the law to the facts, are reviewed de novo without any presumption of correctness.  Id.

## C. Warrantless search

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression."  Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7).  As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject to only a few specifically established and well delineated exceptions.'"  Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).  The trial court held, and the State concedes on appeal, that Agent Utterback's original search of the Defendants' cell phones violated the Fourth Amendment.  See Riley, 134 S. Ct. at 2493.

## D. Independent source doctrine

Evidence "directly or derivatively obtained from an unconstitutional search or seizure" is subject to the exclusionary rule, which operates "to bar the admissibility" of such evidence.  State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992) (citing Wong Sun v. United States, 371 U.S. 471, 485 (1963)).  "However, it has long been recognized that evidence obtained by means genuinely independent of the constitutional violation is not subject to the exclusionary rule."  Id.  The reason for this is that "'while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.'"  Id. (quoting Murray v. United States, 487 U.S. 533, 542 (1988)).

The independent source doctrine prevents the exclusion of illegally obtained evidence when "(1) the evidence is later discovered during a search pursuant to a valid warrant, (2) this valid warrant was obtained without reference to evidence uncovered during the illegal search, and (3) the government agents would have obtained the warrant even had they not made the illegal entry."  Clark, 844 S.W.2d at 600 (citing Murray, 487

U.S. at 543). The decision whether the independent source doctrine is to be applied in this case rests on the third of these criteria.

A search pursuant to a warrant is not "a genuinely independent source" when "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry." Murray, 487 U.S. at 542. The trial court concluded that "the State would still have sought a warrant to search the cell phones regardless of [the] information obtained from the pre-Riley search." However, the evidence from the suppression hearing preponderates against this finding.

Agent Utterback testified that General Jones contacted him after the Riley decision was issued and asked him to perform a confirmatory search of the phones to "see if it[ was] worth [] getting a search warrant." Agent Utterback further testified that he found evidence that he thought was "beneficial" and "vital to the prosecution of [the] case" and that he informed General Jones that they "probably needed" that evidence. General Jones recalled asking Agent Utterback if it would be "worthwhile to fight about" the admissibility of the cell phones and that Agent Utterback responded that "there was worthwhile evidence on the cell phone[s]."

It was only after the confirmatory search was performed, and the results of that search were shared with General Jones, that the decision to get a search warrant was made. The evidence at the suppression hearing established that the "decision to seek the warrant was prompted by what [Agent Utterback] had seen during the initial" illegal searches of the cell phones. See Murray, 487 U.S. at 542. As such, the independent source doctrine does not prevent the exclusion of the evidence recovered from the Defendants' cell phones. Accordingly, we conclude that the trial court erred in denying the Defendants' motions to suppress on this basis.

### E. Good-faith exception

The State argues that the good-faith exception to the exclusionary rule recently adopted by our supreme court in Reynolds applies to the information recovered from the Defendants' cell phones. The good-faith exception allows the admission of otherwise unadmissible illegally seized evidence "only when the law enforcement officers' action is in objectively reasonable good faith reliance on 'binding appellate precedent' that 'specifically authorizes a particular police practice.'" Reynolds, 504 S.W.3d at 313 (quoting Davis v. United States, 564 U.S. 229, 241 (2011)). The purpose of this "narrowly defined" exception to the exclusionary rule is to adequately preserve "'the protections provided by our state and federal constitutions while not penalizing police officers for performing their duties conscientiously and in good-faith.'" Id. (quoting Parker v. Commonwealth, 440 S.W.3d 381, 387 (Ky. 2014)).

In arguing that Agent Utterback was relying on "binding appellate precedent" when he searched the Defendants' cell phones without a warrant, the State cites one unreported opinion by a panel of this court, State v. Dane Sayles, alias Bradley Harper, No. E2012-00138-CCA-R3-CD, 2013 WL 1870058 (Tenn. Crim. App. 2013), perm. app. denied (Tenn. Oct. 16, 2013). Our research has not revealed any other Tennessee opinions that dealt with this issue prior to Riley. The panel in Sayles held that "the trial court's admission of the contents of [two] cell phones [seized incident to the arrest of a co-defendant] was proper." Id. at *17. At issue were "photographs of particular text messages" taken by the arresting officers at the scene of the arrest and testimony about "the timing of the text messages" from a police employee who had conducted a forensic examination of the phones. Id. However, the police employee "did not testify regarding the content of [the] text messages, and the compact discs containing the cell phone data never were entered into evidence." Id.

In noting the "'narrowness of [its] holding,'" our supreme court emphasized that the law enforcement officer's reliance must be on binding appellate precedent and specifically stated that "[p]ersuasive precedent from other jurisdictions is not a sufficient basis for applying the [] good-faith exception." Reynolds, 504 S.W.3d at 313 (quoting and citing State v. Lindquist, 869 N.W.2d 863, 876 (Minn. 2015)). Similarly, unpublished opinions of this court are only "controlling authority between the parties to the case" and "for all other purposes shall be considered persuasive authority." Tenn. Sup. Ct. R. 4(G)(1). As such, there was no binding appellate precedent for Agent Utterback to rely on when he searched the Defendants' cell phones. The good-faith exception does not "permit law enforcement officers to 'extend the law to areas in which no precedent exits or the law is unsettled.'" Reynolds, 504 S.W.3d at 313 (quoting Lindquist, 869 N.W.2d at 876-77).

Additionally, while the good-faith exception applies to "objectively reasonable" good faith reliance, we also note that Agent Utterback testified that he believed he could search the Defendants' cell phones incident to arrest based on his training and the fact that such searches were "a regular practice" among other TBI agents and "officers [] on the side of [the] road[] on traffic stops" rather than a binding appellate precedent. Likewise, General Jones testified that prior to Riley, he believed officers could search a cell phone incident to arrest, but he was unaware of any specific case law that authorized such practices. Accordingly, we conclude that the Reynolds good-faith exception does not apply to this case.

### F. Harmless error

Our conclusion that the trial court erred in denying the Defendants' motions to suppress does not end our analysis. Such an error is a non-structural constitutional error, subject to harmless error analysis. State v. Hutchison, 482 S.W.3d 893, 921 (Tenn.

2015). "As a non-structural constitutional error, the erroneous admission of this evidence is only harmless when it appears beyond a reasonable doubt that its admission did not contribute to the verdict." State v. Ingram, 331 S.W.3d 746, 759 (Tenn. 2011). In making this determination, we do not simply calculate whether sufficient evidence exits to support the conviction. State v. Sexton, 368 S.W.3d 371, 429 (Tenn. 2012). But, "the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict, beyond a reasonable doubt." Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979). "The State bears the burden of demonstrating that the error is harmless beyond a reasonable doubt." Hutchinson, 482 S.W.3d at 921.

The information recovered from Defendant Pratikkumar's cell phone, the evidence of his lengthy romantic affair with Ms. Newman, the evidence of his internet search history regarding the legal consequences for accidentally shooting and killing someone, and the evidence of the life insurance policy for Defendant Pratikkumar's wife, was all evidence establishing the Defendants' motive to have Defendant Pratikkumar's wife killed. Motive was not an element of the charged offenses. See Tenn. Code Ann. §§ 39-12-102, -103, -107. Even without that evidence of motive, the evidence of the Defendants' guilt was overwhelming. The jury was presented with Mr. Robinson's testimony and chose to accredit his testimony. Additionally, there was substantial evidence to corroborated Mr. Robinson's testimony, such as the recorded telephone conversations with Defendant Pratikkumar, the video surveillance from the Sam's Club parking lot, and the evidence that Mr. Robinson turned over to Agent Utterback. Accordingly, we conclude that it appears beyond a reasonable doubt that the admission of the illegally seized evidence from the Defendants' cell phones did not contribute to the verdict; therefore, the trial court's error in admitting the evidence was harmless.

### G. The Defendants' remaining search issues

In addition to the arguments addressed above, the Defendants contend that the search warrant Agent Utterback procured in an attempt to cure his original warrantless searches was invalid. Specifically, the Defendants contend that the search warrant was not executed within the applicable time frame. The Defendants also contend that Agent Utterback was not authorized to issue an administrative subpoena for the Defendants' cell phone records, which provided the probable cause in his warrant application; therefore, Agent Utterback acquired their cell phone records in violation of the federal Stored Communications Act. We do not find the Defendants' arguments to be persuasive.

### 1. Execution of the search warrant

At the suppression hearing, Agent Utterback testified that the search warrant for the Defendants' cell phones was issued on July 10, 2014. Agent Utterback further

testified that he executed the search warrant on July 14, 2014, by taking the cell phones out of the evidence "vault" and walking them to the TBI "technical services unit" where he "signed them" in and placed them in the unit's evidence "cage." Agent Mason testified that he extracted the data from Defendant Kalpesh's cell phone on July 17, 2014, and from Defendant Pratikkumar's cell phone on August 1, 2014. In its written order denying the motions to suppress, the trial court concluded that the search warrant was executed when Agent Utterback transferred the cell phones to the TBI "technical services unit."

Tennessee Code Annotated section 40-6-107(a) provides that a search warrant "shall be executed and returned to the magistrate by whom it was issued within five (5) days after its date, after which time, unless executed, it is void." See also Tenn. R. Crim. P. 41(e)(3) (providing that a search warrant "must be executed within five days after its date"). The Defendants contend that the search warrant was not executed until Agent Mason extracted a copy of the data from the cell phones. The State responds that the warrant was executed when Agent Utterback transferred the cell phones to the TBI "technical service unit."

The issue of when a search warrant for forensic analysis of a digital device that has already been seized by law enforcement officers has been executed is one of first impression in this state. However, based upon our review of decisions from other jurisdictions that have addressed this issue, we conclude that the search warrant was executed when Agent Utterback transferred the cell phones to the TBI technical service unit. See United State v. Austin Ayers Winther, No. 11-212, 2011 WL 5837083, at *12 (E.D. Pa. Nov. 18, 2011) (noting that federal courts had "routinely held that the two-step seizure and search process for computers was constitutional" even when the analysis of the seized computer was performed after the applicable warrant-execution deadline); State v. Nadeau, 1 A.3d 445, 463 (Me. 2010) (holding that a search warrant for a computer already in the possession of law enforcement was "effectively executed at the time it was issued" because "there was no danger that a search" of the computer after the applicable warrant-execution deadline "would result in a seizure based on stale probable cause"); Commonwealth v. Ericson, 10 N.E.3d 127, 133 (Mass. App. Ct. 2014) (recognizing that when a cell phone "rests in the custody of the police and not of the suspect, the information (content of the cell phone) supporting the probable cause determination is less likely to change").

## 2. Administrative subpoena

Tennessee Code Annotated section 38-6-102(a) provides that TBI agents operating in the criminal investigation division when assigned to aid an investigation at the request of a local District Attorney General "shall have full power to issue subpoenas for witnesses, serve the subpoenas, administer oaths to witnesses as they may summon, [and]

to take written statements from them." Based upon the wording of section 38-6-102(a), the Defendants argue that TBI agents lack the power to issue administrative subpoenas "to compel production of documents or records." However, the subpoenas were issued to the custodian of records for each of the phone companies and ordered them to appear personally before Agent Utterback. Agent Utterback testified that it was common practice for a company's custodian of records to simply send the requested documents rather than personally appear before him.

Our supreme court, in addressing a similarly worded predecessor to section 38-6-102(a), has found a TBI agent's administrative subpoena power pursuant to section 38-6-102(a) to be similar to other types of administrative subpoenas which explicitly provide that subpoenas may be issued for witnesses and "documentary evidence." State v. Hathcock, 528 S.W.2d 47, 48-49 (Tenn. 1975), overruled on other grounds, State v. Harrison, 270 S.W.3d 21 (Tenn. 2008). Accordingly, we do not find the Defendants' argument that section 38-6-102(a) is limited only to "witnesses" to be persuasive. Additionally, the Defendants "had no expectation of privacy in the telephone records in the possession of and owned by the telephone company."[6] State v. Hodgkinson, 778 S.W.2d 54, 62 (Tenn. Crim. App. 1989). Furthermore, suppression of evidence "is not a remedy for a violation of the [federal] Stored Communications Act" cited by the Defendants. United States v. Guerrero, 768 F.3d 351, 358 (5th Cir. 2014). As such, we conclude that this issue is devoid of merit.

### III. Defendant Kalpesh's sentence

Defendant Kalpesh contends that the trial court erred in not sentencing him as an especially mitigated offender. Defendant Kalpesh concedes that the trial court "found no enhancement factors or mitigating factors" applicable to his sentencing. However, Defendant Kalpesh argues that the trial court should have found that the following mitigating factors applied: (1) that he "played a minor role in the commission of the offense"; (2) that he "committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct"; and (3) that he "generally should have been determined to [have been] an especially mitigated offender pursuant to the catch-all provision." See Tenn. Code Ann. §§ 40-35-113(4), (11), (13). The State responds that the trial court did not abuse its discretion in sentencing Defendant Kalpesh as a Range I, standard offender.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and

---

[6] We do note that the cell phone records at issue here did not include cell phone tower location records.

principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

A trial court "may find the defendant is an especially mitigated offender, if: (1) [t]he defendant has no prior felony convictions; and (2) [t]he [trial] court finds mitigating, but no enhancement factors." Tenn. Code Ann. § 40-35-109(a) (emphasis added). This provision is discretionary, and a trial court is not obligated to sentence a defendant as an especially mitigated offender even if the defendant is eligible for such a classification. State v. Braden, 867 S.W.2d 750, 762-63 (Tenn. Crim. App. 1993). Defendant Kalpesh did not qualify as an especially mitigated offender because the trial court did not find any applicable mitigating factors. Nor did the trial court abuse its discretion in finding that there were no applicable mitigating factors. Furthermore, classification as an especially mitigated offender is discretionary, and the trial court would not have been obligated to

so classify Defendant Kalpesh even if there was an applicable mitigating factor. Accordingly, we conclude that the trial court did not abuse its discretion in sentencing Defendant Kalpesh as a Range I, standard offender.

## IV. Motion for new trial issues

Defendant Kalpesh contends that a new trial is warranted based on newly discovered evidence that Mr. Robinson used a large sum of cash to purchase a truck in early October 2013 and that "Mr. Robinson had at least consulted with a criminal defense attorney" prior to contacting the TBI. Defendant Pratikkumar contends that the State withheld exculpatory evidence by failing to disclose that Agent Utterback had asked Mr. Robinson if he had kept any of the money Defendant Kalpesh gave him. Defendant Pratikkumar also contends that he received ineffective assistance from his trial counsel because trial counsel failed to investigate an alleged discrepancy in the amount of money Defendant Kalpesh gave Mr. Robinson and because trial counsel failed to challenge the cell phone records Agent Utterback administratively subpoenaed. The State responds that these issues are without merit.

## A. Factual background

On January 19, 2016, the trial court held a lengthy hearing on the Defendants' motions for new trial. Before the sentencing hearing, an investigator for Defendant Kalpesh's attorney ran a public records search on Mr. Robinson and discovered that Mr. Robinson had purchased a truck in October 2013. Agent Utterback testified that he was approached by Defendant Kalpesh's attorney at the sentencing hearing and asked if he had suspected Mr. Robinson of stealing money. Agent Utterback explained that Mr. Robinson had provided him with $15,000 on September 30, 2013. However, when Agent Utterback interviewed Defendant Kalpesh after his arrest, Defendant Kalpesh claimed that he had given Mr. Robinson $25,000.

Agent Utterback testified that he asked Mr. Robinson if he had taken $10,000 and Mr. Robinson said that he did not. Agent Utterback further testified that he never suspected Mr. Robinson of taking any money and that he believed Mr. Robinson's account over Defendant Kalpesh's. Agent Utterback explained that the idea there was $10,000 missing was based solely on Defendant Kalpesh's statement after his arrest and that there was never an "investigation" into whether Mr. Robinson had taken $10,000. Agent Utterback testified that he never met with an attorney representing Mr. Robinson and that Mr. Robinson never told him that he was represented by an attorney.

Mr. Robinson testified that on October 28, 2015, he gave a written statement to Agent Utterback about his purchase of a truck in October 2013. Consistent with his statement to Agent Utterback, Mr. Robinson testified that he purchased a truck for

approximately $6,000 in cash on October 18, 2013. Mr. Robinson explained that he had been saving money to purchase a new vehicle. Mr. Robinson further explained that he had $1,000 that he won from a lottery ticket, $900 that he won from a poker machine, $3,000 that he had saved, and that he took out a loan for $3,000 on October 18, 2013, to help cover the remaining approximately $1,000 he owed for the truck. Mr. Robinson testified that he repaid the loan in early 2014 after having completed a few construction jobs. Mr. Robinson admitted that he lied about the purchase price of the truck on his registration because he was "trying to get [his] tags cheaper."

The Defendants presented several witnesses who established that Mr. Robinson purchased the truck on October 16, 2013, two days before he took out the loan on October 18, 2013. Afterwards, Mr. Robinson was recalled and testified that he was mistaken about the date he purchased the truck. Mr. Robinson explained that he thought that it was the same day he had taken out the loan and that it was "an honest mistake." Mr. Robinson further explained that he took money from a construction job to cover the $1,000 he needed to purchase the truck and that he paid the money back with the money from the loan he took out on October 18, 2013.

Thomas Parkerson testified that he was a criminal defense attorney. Mr. Parkerson was contacted by Mr. Mansfield about this case on September 30, 2013. Mr. Parkerson testified that he met with Mr. Robinson for approximately thirty minutes that day and then contacted the District Attorney General in order to get Mr. Robinson in touch with the TBI. Mr. Parkerson denied having represented Mr. Robinson or having accepted any money from Mr. Robinson. Mr. Parkerson further denied that he attended any meetings between Mr. Robinson and the District Attorney General's office or the TBI. Mr. Parkerson testified that he never felt like he was Mr. Robinson's attorney.

Sarah Davis testified that she was the Assistant District Attorney General who took over this case for General Jones in late 2014. General Davis testified that she was unaware of Mr. Robinson's ever having been offered immunity for his participation in this case or ever having retained an attorney. General Davis also testified that she was unaware of Mr. Robinson's purchase of the truck in October 2013 until she was told about it by the Defendants' attorneys.

Defendant Pratikkumar's lead trial counsel testified that he was aware of Defendant Kalpesh's claim to have given Mr. Robinson $25,000 and that he had discussed this with Defendant Kalpesh's attorneys. However, lead counsel chose not to investigate the discrepancy because he thought it would not have mattered to a jury whether Defendant Pratikkumar paid $25,000 or $15,000 to have his wife killed. Lead counsel further explained that he did not want to impeach Mr. Robinson's credibility because he wanted the jury to believe Mr. Robinson's testimony that he would have never assisted in the murder of Defendant Pratikkumar's wife.

Lead counsel testified that after his motion to suppress the evidence recovered from Defendant Pratikkumar's cell phone was denied, it seemed "it was going to be patently obvious what had happened here factually." Therefore, lead counsel concluded that "the only way to defend the case was to take the narrow approach, that because Mr. Robinson had never agreed to commit the crime, and no other person to [their] knowledge had done so, that that would not constitute a conspiracy to commit first degree murder under Tennessee law." To that end, lead counsel chose not to probe Mr. Robinson's background because he thought Mr. Robinson's original statement to the TBI would best support this defense.

Lead counsel testified that even if he had known about Mr. Robinson's purchase of a truck in October 2013 or had known for a fact that Mr. Robinson had taken $10,000 from the Defendants, he did not believe that would change his trial strategy or the outcome of the trial. Lead counsel explained that in order to get the discrepancy in the amount of money given to Mr. Robinson into evidence, one of the Defendants would have had to testify or Defendant Kalpesh's statement would have to have been admitted. Lead counsel thought that doing this would have been "a grave mistake." Lead counsel also testified that he did not challenge the cell phone records Agent Utterback obtained with an administrative subpoena because it was "third party information" and Defendant Pratikkumar had no standing to do so.

Co-counsel similarly testified that Defendant Pratikkumar had no standing to challenge the cell phone records obtained by Agent Utterback. Co-counsel testified that he was aware of the $10,000 discrepancy from reviewing the discovery materials and because Defendant Pratikkumar had told them that he had given Defendant Kalpesh $25,000. Co-counsel explained that they did not investigate the discrepancy because they wanted the jury to believe Mr. Robinson's testimony that he never intended to harm Defendant Pratikkumar's wife or hire a third party to do so. Co-counsel further explained that he believed that, given the evidence from Defendant Pratikkumar's cell phone, there was very little room to attack Mr. Robinson's credibility. Co-counsel testified that they reviewed their trial strategy with Defendant Pratikkumar and that Defendant Pratikkumar did not object to it.

### B. Defendant Kalpesh's claim of newly discovered evidence

A new trial will be granted on the basis of newly discovered evidence only when a defendant has established the following: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994)). To demonstrate reasonable diligence, a defendant must show that neither he nor his trial counsel "had knowledge of the alleged newly discovered evidence prior to trial." Id. at

117. The decision to grant or deny a new trial on the basis of newly discovered evidence "rests within the sound discretion" of the trial court. Id.

The trial court did not abuse its discretion in denying Defendant Kalpesh's motion for a new trial on the grounds of newly discovered evidence because none of the evidence cited by Defendant Kalpesh was new. Defendant Kalpesh asserts on appeal that his attorneys "were not privy to any information [Defendant Pratikkumar] may have given his counsel regarding how much money was given to [Mr.] Robinson"; therefore, Defendant Kalpesh and his attorneys had no reason to investigate Mr. Robinson's finances. The record belies this assertion. The alleged discrepancy in the amount of money given to Mr. Robinson was based on Defendant Kalpesh's statement to Agent Utterback and included in the discovery materials the State provided to the Defendants. Furthermore, lead counsel for Defendant Pratikkumar testified that he discussed the discrepancy with Defendant Kalpesh's attorneys.

Mr. Robinson purchased the truck in October 2013. The trial in this case occurred in August 2015. An investigator for Defendant Kalpesh's attorneys discovered the purchase around the time of the sentencing hearing in October 2015, by performing a public records search. However, the purchase occurred well in advance of the trial and the public records associated with the purchase would have been available in advance of the trial as well.[7] As such, this evidence was not new nor can we say that Defendant Kalpesh and his attorneys were reasonably diligent in attempting to obtain it. With respect to Mr. Parkerson's association with Mr. Robinson, the State disclosed to the Defendants Mr. Parkerson's participation in this matter prior to the opening statements of the trial and Mr. Mansfield testified about Mr. Parkerson's involvement during the trial. Again, this evidence was not new. Accordingly, we conclude that the trial court did not abuse its discretion in denying Defendant Kalpesh's motion for new trial on these grounds.

### C. Defendant Pratikkumar's claim of withheld exculpatory evidence

Defendant Pratikkumar contends that the State withheld exculpatory evidence by failing to disclose that Agent Utterback had asked Mr. Robinson about the alleged $10,000 discrepancy. However, Defendant Pratikkumar cites no legal authority in his brief to support this contention. Accordingly, Defendant Pratikkumar has waived full appellate review of this issue. See Tenn. R. Ct. Crim. App. 10(b) (providing that issues "which are not supported by . . . citation to authorities . . . will be treated as waived in this court"). Accordingly, we review this issue solely for plain error.

---

[7] We also note that Defendant Pratikkumar asserts in his brief that Mr. Robinson's purchase of the truck would have been discovered prior to trial if trial counsel had chosen to investigate Mr. Robinson's background.

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, Defendant Pratikkumar has failed to show that he did not waive the issue for tactical reasons. Page, 184 S.W.3d at 230. Lead counsel and co-counsel both testified at the motion for new trial hearing that they chose not to investigate the alleged $10,000 discrepancy because they thought that it would not have mattered to the jury in light of the evidence from Defendant Pratikkumar's cell phone and his recorded phone conversation with Mr. Robinson. Additionally, they did not want to impeach Mr. Robinson's credibility because they wanted the jury to believe that he would not have participated in a conspiracy to kill Defendant Pratikkumar's wife. This was key to their defense strategy of arguing that the State had failed to legally establish a conspiracy between the Defendants. Accordingly, we conclude that the doctrine of plain error does not apply to this issue.

### D. Defendant Pratikkumar's claims of ineffective assistance of trial counsel

Although a defendant may raise an ineffective assistance of counsel claim in his motion for new trial, this court has repeatedly noted that "the practice . . . is fraught with peril since it is [typically] impossible to demonstrate prejudice as required" at that stage of the proceedings. State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (internal quotation marks omitted). Nevertheless, there is no prohibition against litigation of ineffective assistance of counsel claims as part of the motion for new trial, as opposed to collateral proceedings. See State v. Burns, 6 S.W.3d 453, 461-63 (Tenn. 1999); State v. James Paris Johnson, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at *17 (Tenn. Crim. App. Sept. 15, 2010).

The same standard applies to claims of ineffective assistance of counsel raised in a motion for new trial and in a petition for post-conviction relief. See Burns, 6 S.W.3d at 461 n.5. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence.

Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the lower court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). However, we review the lower court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the defendant to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In reviewing a trial counsel's conduct, we make every effort to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting Strickland, 466 U.S. at 689). We also recognized that there "'are countless ways to provide effective assistance [of counsel] in any given case'" and that "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" Id. (quoting Strickland, 466 U.S. at 689-91). It is trial counsel's duty "'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Id. (quoting Strickland, 466 U.S. at 691). "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." Id. (citing Goad, 938 S.W.2d at 369).

Defendant Pratikkumar's lead and co-counsel both testified at the motion for new trial hearing that they chose to focus on a "narrow approach" and argue that the State had failed to legally prove the existence of a conspiracy due to Mr. Robinson's feigned

participation. They chose to do so after the trial court denied their motion to suppress the evidence recovered from Defendant Pratikkumar's cell phone. Lead counsel testified that he felt "it was going to be patently obvious what had happened [] factually" in light of the evidence from the cell phones. Co-counsel testified that they reviewed this trial strategy with Defendant Pratikkumar and that he did not object to it.

Both lead and co-counsel testified that this strategy did not require a thorough investigation into Mr. Robinson's background. Furthermore, both lead and co-counsel testified that they did not want to impeach Mr. Robinson's credibility because they wanted the jury to believe his testimony that he was only feigning his participation in the plot to murder Defendant Pratikkumar's wife. They believed that testimony to be key to their trial strategy. Accordingly, we conclude that lead and co-counsel were not deficient in their decision to pursue a "narrow" legal strategy nor in their decision not to investigate Mr. Robinson and the alleged $10,000 discrepancy more thoroughly.

With respect to Defendant Pratikkumar's claim that lead and co-counsel were ineffective for failing to attempt to suppress the cell phone records obtained by Agent Utterback via an administrative subpoena, we have previously found Defendant Pratikkumar's argument that the cell phone records were "illegally seized" in violation of the federal Stored Communications Act to be devoid of merit. Accordingly, we conclude that Defendant Pratikkumar did not receive ineffective assistance of counsel with respect to this issue and that the trial court did not err in denying his motion for new trial on these grounds.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE